JULIA A. ROBISON, IMPLEADED, ETC.,

v.

WILLIAM F. ROOS AND HORACE W. HENSHAW.

*Principal and Surety—Payment by Surety—Subrogation—Partnership —Dissolution—Subsequent Profits.*

1. One who receives funds from another to be applied for the benefit of a third person, can not refuse to so apply them, or claim them as his own upon the ground that such other was under no obligation to make the payment in question.

2. Where the person receiving such fund invests it in his own name, instead of paying it over, as between him and the person from whom he receives it, the relation of principal and surety arises, and the latter as surety may, if the beneficiary compels him to pay the same anew, follow and recover the fund so invested, whether in the hands of the principal or of another holding under him with notice.

[Opinion filed February 10, 1891.]

APPEAL from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding.

Mr. S. M. MILLARD, for appellant.

Where a deceased partner at the time of his death had no assets, his estate is not entitled to subsequent profits. Lindley on Partnership, Vol. 2, p. 532; Simpson v. Chapman, 4 De G., M. & G. 154; Wedderburn v. Wedderburn, 2 Keen, 722, 4 M. & Cr. 41; Vyse v. Foster, 8 Ch. 309 and L. R., 7 H. L. Ca. 318.

The last three cases are given in substance in Lindley on Partnership, 532–6, and are of more than passing importance

for the similarity with the facts in the case at bar. So far as the plant is concerned, if it was an asset or of value to the business, the representatives of C. Y. Robison could recover rent or use of the property as an equitable adjustment. Ligare v. Peacock, 109 Ill. 94.

The lien of a co-partner only extends to property of the firm and not to profits made after dissolution. Lindley on Partnership, 353.

At the time of the death of C. Y. Robison there were no assets or profits. All were made after his death, and so far as his estate or representatives had any rights thereto, they were by reason of the donation or gift on the part of the co-partner.

Where money is held in trust and put into bank with funds of trustee, the law presumes the owner draws on the common fund from his own moneys first, so that if there remains in the bank ample funds to cover the trust money, the presumption is the trust money is in the bank intact and the owner's money was the first drawn out. Lewin on Trusts and Trustees, 895; Re Hallett's Estate, 13 Ch. D. 696.

The mere fact that a trustee has trust money in his hand when he makes a purchase is not sufficient to attach the trust on lands bought by him. Lewin on Trusts, p. 897.

The principle of subrogation does not apply to transactions between partners. Dixon on Subrogation, p. 149; Bailey v. Brownfield, 20 Penn. R. 41 (8 How.); Sheldon on Subrogation, Sec. 171; Fessler v. Hickernell, 82 Penn. 150.

One co-partner can not claim a lien on the separate estate of his co-partner after dissolution. Sheldon on Subrogation, Sec. 171; In re Smith, 16 N. B. Ry. 113.

Subrogation applies only when a special security as a mortgage or other distinct security is passed, and which, on payment of the debt, returns to the principal debtor. Dixon on Subrogation, 47 and 48.

By the Roman law subrogation would have no effect if there were other persons than the common debtors who were bound to the creditors except by special stipulation. Dixon on Subrogation, 20–42.

At common law the surety has his action of assumspit and is not subrogated as of right to action of the creditor. Dixon on Subrogation, 46.

But as no accounting was had, the question remains open and has not been adjudicated between the parties hereto or between the legal representatives of C. Y. Robison.

Only personal representatives of a deceased partner can require a survivor to account. Lindley on Part., 611; Story on Partnership, Sec. 347.

In suit to subject land of intestate decedent to payment of a judgment, the administrator is a necessary party. McDowell v. Cochran, 11 Ill. 31.

Messrs. SEARS & ARND and JESSE HOLDOM, for appellees.

The doctrine of subrogation in equity is sufficiently broad to cast upon appellees all the rights which the heirs of C. Y. Robison would be invested with, had they been the complainants below seeking to charge the Maywood property with a trust arising from the facts in evidence surrounding the acquiring of the title thereto by C. H. Robison and appellee in this case. In Memphis, etc., R. R. v. Dow, 120 U. S. 301, the court said:

" The right of subrogation is not founded on contract; it is a creature of equity. It is enforced solely for the purpose of accomplishing the ends of substantial justice, and is independent of any contractual relations between the parties."

The doctrine requires, first, that the person seeking its benefit must have first paid a debt due to a third party; second, that he must not act as a mere volunteer, but on compulsion, to save himself from loss by reason of a superior lien or claim on the part of the person to whom he pays the debt, as in cases of sureties, etc.

In Ætna L. I. Co. v. Town of Middleport, 124 U. S. 534, on page 549, Justice Miller quotes with approval the doctrine as thus stated in Gadson v. Brown, Spear's Eq. (So. Car.) 37–41, where Chancellor Johnson says: " The doctrine of subrogation is a pure, unmixed equity, having its foundations in the principles of natural justice, and from its very nature

Robison v. Roos.

never could have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would or would not be bound, and as far as I have been able to learn its history, it never has been so applied. If one with the perfect knowledge of the facts will part with his money or bind himself by his contract in a sufficient consideration, any rule of law which would restore him his money, or absolve him from his contract, would subvert the rules of social order. It has been directed in its application exclusively to the relief of those who were already bound, who could not but choose to abide the penalty;" and Justice Miller observes at the foot of this quotation that " this is perhaps as clear a statement of the doctrine on this subject as is to be found anywhere."

Appellees. clearly come within the rule as thus stated. They were bound as surviving partners to pay the heirs of C. Y. Robison what they were entitled to on an accounting, notwithstanding they had once paid the money to the grandfather, C. H. Robison, and notwithstanding he had invested it in the Maywood property. The heirs were not bound to follow it into the property or take advantage of the trust thus raised in their favor; they could, and they did, insist on the money appellees were compelled to pay by order of a court of competent jurisdiction; the burden of paying twice was cast upon them by the fraudulent conduct of C. H. Robison in investing this money in the Maywood property, and they are in consequence subrogated to all the rights of the heirs of C. Y. Robison, had they filed their bill seeking to charge this property with the trust arising from it having been purchased with their money.

In Dunphy v. Gorman, 132 Ill. App. 135, the court said: "A surety, upon paying the debt of the principal, has a clear right to be substituted in place of the creditor as to all securities held by the latter, and to have the whole benefit he may have had therein." 1 Story's Eq. Jur., Secs. 499–502; McMillan v. James, 105 Ill. 194.

In this case the court held that there was no question as to the right of subrogation. "This court has so applied that

doctrine in the case of a co-tenant paying off a purchase
money mortgage, given by himself to his co-tenant, on land
owned by them as tenants in common, as to allow on the pay-
ment the same rate of interest of ten per cent as the original
debt called for." Simpson v. Gardiner, 97 Ill. 237.

The case of Rice v. Rice, is, as counsel believes, on all fours
with the case at bar (108 Ill. 199), both as to the doctrine of
subrogation, as claimed, and also from the fact that the rela-
tions of the parties were similar.

A surety has a clear right, upon paying the debt of a prin-
cipal, to be substituted in the place of the creditor as to all
the securities held by the latter for the debt, and to have the
same benefit that he would have therein. 1 Story's Eq. Jur.
Sec. 327. Under this equitable doctrine of subrogation, the
sureties, upon payment of this judgment, were entitled to stand
in the place of the personal representatives of the ward, and
have all the means for satisfaction of the payment they made,
that such representatives had in respect to the ward's claim,
and therefore, right of resort to this land, as held in trust for
such purpose. Marsh v. Pike, 10 Paige, 595; McNeill v.
Morrow, Rich. Eq. Cases, 172; Rhame v. Lewis, 13 Rich. Eq.
(S. C.) 269; Cottrel's Appeal, 23 Pa. St. 294.

In this case appellees stand in the place of the heirs of C.
Y. Robison, and are subrogated to all the rights which they
originally had for the recovery of the interest of their ancestor
in the firm, which was intrusted to C. H. Robison.

In Lochenmeyer v. Fogarty, 112 Ill. 572, the court, in dis-
cussing the right of subrogation, on page 583, said:

"It is an established principle of equity that sureties, or
those who stand in the situation of sureties, for those who pay
debt for them, are entitled to stand in the place of a creditor,
or to be subrogated to all his rights as to any fund, lien or
equity which he may have against any other person or prop-
erty on account of the debt." City of Keokuk v. Love, 31
Iowa, 118, is a case also in point, where it is expressly held
that the equities of sureties extend to all the rights of the
creditor respecting the debt which the sureties pay.

"If one party obtains the legal title to property, not only by

fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he can not equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable or legal, by impressing a constructive trust upon the property in favor of the one who is, in good conscience, entitled to it, and who is considered in equity as the beneficial owner." Perry on Trusts, Sec. 166; Spence Eq. Jurisp., Vol. 1, pp. 511–512; McLane v. Johnson, 43 St. 48; Collins v. Collins, 6 La. 368; Thompson v. Thompson, 16 Wis. 94; Ryan v. Dox, 34 N. Y. 307; Robbins v. Robbins, 89 N. Y. 251; Wood v. Rabe, 96 N. Y. 414; Beatty v. Brummett, 94 Ind. 79; Cox v. Ratcliffe, 105 Ind. 378; Deisher v. Stein, 34 Kas. 41; Randall v. Constans, 33 Minn. 336; Pomeroy's Eq. Jur., Sec. 1030–1031.

"An involuntary or implied trust is one which, without being expressed, is deducible from the nature of the transaction as a matter of intent, or which is superinduced upon the transaction by operation of law, as a matter of equity, independently of the particular intention of the parties. Thus, one who wrongfully detains a thing, may frequently be regarded as an involuntary trustee thereof, for the benefit of the owner; as where title to property is acquired through fraud, accident, mistake or undue influence, or the violation of an express trust, or other wrongful act." Brown v. Lynch, 1 Paige (N. Y.), 147; Anderson v. Lemon, 8 N. Y. 236; Wood v. Radcliffe, 2 Phil. (Pa.) 382.

"So a person who buys land with the money of another and takes a conveyance of the legal title to himself, becomes trustee of a resulting trust in favor of the person whose money was used to pay the consideration, even though the former stood in no fiduciary character to the person whose money was used." Beck v. Uhrich, 13 Pa. State, 636; Williams v. Hollingsworth, 1 Strob. (S. C.) Eq. 103.

"A constructive trust is one that arises when a person, clothed with some fiduciary character, by fraud or otherwise, gains some advantage to himself. Courts construe this to be an advantage for the *cestui que trust,* or a constructive trust.

Constructive trusts may be divided into three classes: First, trusts that arise from actual fraud. Second. Trusts that arise from constructive fraud. Third. Trusts that arise from some equitable principle independent of the existence of any fraud."

If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience, to hold and enjoy the beneficial interests of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances and relations, and this trust they will fasten upon the property in the hands of the offending party, and will convert him into a trustee of the legal title, and will order him to hold it or execute the trust in such manner as to protect the rights of the defrauded party, who is the beneficial owner. Pom. Eq. Jur., note 2, Vol. 2, page 617; Perry on Trusts, Sec. 166.

The money received by C. H. Robison, being trust money, may be followed into whatever it entered, and the court will impress a trust upon whatever property it entered and formed a part.

The mixing by C. H. Robison of the trust money with that of his own, by depositing the same to his own individual bank account, where he had moneys of his own on deposit, will not destroy the lien of the *cestui que trust* in the property, in the purchase of which it was used or formed a part.

"Thus, if trust money is mixed in the same parcel with the trustee's own money, it may be said that the trust money has run into the general mass, and has become absorbed, and that the *cestui que trust* has no lien, but such can not be the case." Ford v. Hopkins, 1 Salk. 283.

GARY, J.   On the first day of June, 1882, Charles H. Robison, husband of appellant, who is now a widow, he having died while this suit has been pending, Charles Y. Robison, their son, and the appellees, William F. Roos and Horace W.

Henshaw, formed a co-partnership; the business being the manufacture of butterine in Chicago.

On the third day of December, 1883, Charles Y. Robison died intestate, leaving surviving him his widow, Marguerite (since re-married, and now Mrs. Breyfogle, which, perhaps, accounts for all the trouble), and two boys, their sons.

Up to the time of the death of Charles Y. Robison the business had not prospered, and if it had been closed out there would have been, probably, nothing coming to his estate from the assets of the firm. The business continued without change until the first day of May, 1884, when the survivors of the firm and William E. Roos (not a party to, or interested in this litigation), formed a new co-partnership for the continuance of the business. The new firm continued until the 24th day of June, 1885, when it was dissolved by the other partners selling their interests to Charles H. Robison, he agreeing to pay the debts of the firm. At the same time he, and the widow of his son, executed and delivered to those other partners, this instrument:

"We, the undersigned, hereby, in consideration of the sum of $6,631, paid us this day by William F. Roos, William E. Roos and Horace W. Henshaw, which amount is their proportion of the indebtedness of the firm of Charles H. Robison & Co., to Charles Y. Robison, being six-tenths of the entire amount so due, hereby release and discharge the said William F. Roos, William E. Roos and Horace W. Henshaw, from all claims and demands of said Charles Y. Robison, now deceased, against said firm of Charles H. Robison & Co., or by his estate.

"Witness our hand and seals, this 24th day of June, A. D. 1885.

"C. H. ROBISON,    [SEAL.]

"MAGGIE ROBISON.    [SEAL.]"

Charles H. Robison then gave the widow his note for the sum mentioned in the above release. No specific sum of money was paid to Charles H. Robison by the outgoing partners to hold in trust for the estate or representatives of his son, but the value of the assets of the firm retained by him

was a full equivalent for his own interest in the firm and for all the debts of the firm, including the sum assumed in the release to be due to Charles Y. Robison.

There is, however, a good deal of testimony tending to show, and supporting the finding of the court below, that, as between the partners at the time of the dissolution, a specific part of the money in bank, $6,500, was by them all considered as appropriated and received by Charles H. Robison for the interest of the estate of Charles Y. Robison in the assets.

There is also testimony that Charles H. Robison, the appellant, and the widow of Charles Y. Robison, had conversations recognizing as a fact that Charles H. Robison had the money in his hands for the interest of his son in the assets of the first firm, or the indebtedness of the last firm, as recited in the release, and that Charles H. Robison was about to invest the money in some cottages he was going to build in Maywood. In fact he did build cottages on the land conveyed to him by deed dated June 30, 1885. Charles H. Robison paid, from time to time, to the widow of his son, money, which, if she was claiming or could claim anything in her own right, has reduced the sum in controversy to $4,300. He became embarrassed, if not insolvent.

On the 20th day of October, 1886, letters of administration on the estate of Charles Y. Robison were issued to Benjamin. F. Cummings, by the Probate Court of Cook County, and he sued out of that court a citation to the surviving partners of the first firm, to account for what was due to the estate. This was not served upon Charles H. Robison, but was served upon the appellees, and by a decree of the Probate Court of April 13, 1887, the administrator recovered against them the $4,300, which they paid, and the note made by Charles H. Robison to the widow of his son was delivered to them. In the meantime, the title to the land and cottages had become vested in the appellant.

The bill is filed upon the theory that upon the dissolution of the last firm, money which all the partners owed to the estate of Charles Y. Robison, was, by the terms of the dissolution, from the assets of the firm, intrusted to Charles H.

Robison for the benefit of that estate; that he invested by his own act and intention in the cottages, money which he segregated from his general funds, and specifically devoted to that investment, as money so intrusted to him; that therefore the persons beneficially interested in that estate became entitled to follow that money, as their own, into the cottages; that notwithstanding the dissolution and the release above copied, the appellees remained responsible to the persons beneficially interested, but as between Charles H. Robison and themselves, he was a principal and they only sureties; and that, being compelled to pay, they should be subrogated to the right to follow the money into the cottages, as the appellant took the title with notice. The decree gives them that relief, directing a sale of the property in default of re-payment of what they have paid, with interest and costs. There is sufficient evidence of the facts to make that theory applicable and support the decree; to recite it would take a large space and be of no benefit.

The appellant urges that at the time of the death of Charles Y. Robison the affairs of the first firm were in such a state that he had no assets in it, and therefore his estate is not entitled to share in subsequent profits, citing 2 Lind. Part. 532.

In special cases, such as are there cited, it may be conceded that the general rule does not apply, but in this case the funds in controversy came to Charles H. Robison wholly from the interests of his co-partners in the assets of the last firm, and if they chose to allow the estate of Charles Y. Robison to share in their interests in such assets, neither Charles H. Robison nor any one claiming under him with notice, could repudiate the terms on which he received the funds, and claim that they were his own.

There is in the record no ground for any pretense that the new firm could have been indebted to the estate of Charles Y. Robison upon any other consideration than the right of that estate to share in the profits of the business carried on after his death, without any accounting or adjustment of the affairs of the firm.

The right was recognized by all parties. The dissolution of

the last firm and the release accepted by the outgoing partners were on that basis. It may be that nothing had been done that estopped the appellees in the Probate Court to deny their liability to the administrator of Charles Y. Robison, when there called to account in pursuance of Secs. 87, 88 and 89, of Chap. 3, R. S. of 1872, but at least the manner and terms of that dissolution furnished such strong evidence of the right of the administrator, against all the surviving partners of the first firm, as would have been exceedingly difficult, if not impossible, for them to overcome. Charles H. Robison having, in the dissolution, agreed to pay the debts of the firm, the appellees, as between him and them, were sureties only. Brandt on Guar., Sec. 23. Having paid a debt which he ought to have paid, they have the right of subrogation to the remedy of the creditor. Rice v. Rice, 108 Ill. 199.

The debatable questions in this case are mainly of fact, and the evidence sustains the decree. It is therefore affirmed.

*Decree affirmed.*